UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STEPHANIE MOORE,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            )    Case No. 4:11CV1446 FRB
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

**MEMORANDUM AND ORDER**

        This cause is before the Court on plaintiff's appeal of

an adverse determination by the Social Security Administration.

All matters are pending before the undersigned United States

Magistrate Judge, with consent of the parties, pursuant to 28

U.S.C. § 636(c)

**I.  Procedural History**

        On October 9, 2009, the Social Security Administration

denied plaintiff Stephanie Moore's June 26, 2009, application for

Supplemental Security Income, filed pursuant to Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381, et seq. (Tr. 58, 60-64,

113-15.)[1]  At plaintiff's request, a hearing was held before an

Administrative Law Judge (ALJ) on May 19, 2010, at which plaintiff

and a vocational expert testified. (Tr. 24-57.)  On June 21, 2010,

_____

        [1]In the application, plaintiff claimed she became disabled on
December 1, 2008.  Plaintiff subsequently amended her alleged onset
date to June 25, 2009.  (Tr. 130.)

the ALJ denied plaintiff's claim for benefits.  (Tr. 9-20.)  On June 27, 2011, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  (Tr. 1-4.)  The ALJ's decision is thus the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

A.  <u>Plaintiff's Testimony</u>

At the hearing on May 19, 2010, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-three years of age.  Plaintiff is single and has no children.  Plaintiff lives in an apartment with a friend who pays the rent.  (Tr. 31-32.)  Plaintiff obtained a GED and received vocational training in culinary arts.  (Tr. 32-33.)  Plaintiff receives food stamps.  (Tr. 33-34.)  Plaintiff has applied for Medicaid.  (Tr. 42.)

Plaintiff's Work History Report shows plaintiff to have worked cleaning dorms from November 1994 to August 2007 while incarcerated.  From September 2007 to January 2008, plaintiff worked at Pro-Mold, a plastics factory, trimming and boxing plastic.  Plaintiff worked at Popeye's Chicken from January to June 2008 preparing and cooking chicken as well as performing cleaning duties.  (Tr. 145-53.)  Plaintiff testified that she was self-employed in 2009 cleaning houses, yards, and her church.  Plaintiff testified that she stopped such work in June 2009 because of problems with her back and legs, she lacked transportation, and

because she felt hot all of the time as though she would pass out. (Tr. 34-35, 41.)

Plaintiff testified that she has been unable to work since June 2009 because of her thyroid, legs, feet, heel spurs, and heart. Plaintiff testified that she has muscle spasms and that her medication causes her to become drowsy and tired. Plaintiff also testified that her eyes are blurry and run a lot. Plaintiff testified that with her work while incarcerated, she was required to take a break every hour because of problems with her legs and heart, caused by thyroid issues. Plaintiff testified that the prison officials did not want her to overdo it. (Tr. 40-41.)

Plaintiff testified that she saw a psychiatrist for "anger issues" while she was incarcerated, and that it was subsequently determined that she had issues with depression and attitude. (Tr. 39-40.) Plaintiff testified that her doctor told her that it all may be related to her thyroid condition. Plaintiff testified that she is currently depressed and cries. Plaintiff testified that she shakes when she is upset but does not lash out. Plaintiff testified that she has difficulty getting out of bed on some days and that she spends four days a week in bed. (Tr. 47.)

Plaintiff testified that her thyroid condition causes her to feel tired, have eye pain, have pain in her lower back, and have muscle spasms throughout her body. Plaintiff testified that she experiences muscle spasms every day or every other day and tries to

- 3 -

rub them out when they begin.  Plaintiff testified that they last
five to ten minutes.  Plaintiff testified that her eyes are blurry
every day and that she places a cold towel over her eyes to help.
Plaintiff testified that she experiences dizziness when she rises
from a seated position or from lying down.  Plaintiff testified
that her physician has stated that resolving her thyroid condition
may resolve the problems she is having with her heart rate.
Plaintiff testified that she has medication and takes it as
prescribed.  Plaintiff testified that her physician would like for
her to undergo additional testing but that she cannot obtain such
tests without Medicaid.  (Tr. 41-44.)

        Plaintiff testified that her knees crack and that it is
difficult to bend them when she walks.  Plaintiff testified that
she has difficulty standing for long periods of time due to the
pain.  Plaintiff testified that she can stand for about five
minutes before feeling the need to sit.  (Tr. 45.)  Plaintiff
testified that she cannot run but can walk the distance of a block
if she takes a break.  Plaintiff testified that she has difficulty
sitting on account of pain in her back but that she is okay if she
is able to move while sitting.  Plaintiff testified that she could
sit for up to thirty minutes at one time.  Plaintiff testified that
she has difficulty bending over at the waist because of her back
and knees.  Plaintiff testified that she could squat if she had to,
but with pain.  (Tr. 46-47.)  Plaintiff testified that her

- 4 -

concentration and focus are okay if she is not involved in a long
drawn-out conversation.  (Tr. 50.)

          As to her daily activities, plaintiff testified that she
gets out of bed at 10:00 a.m. on those days that she does not stay
in bed for the day.  Plaintiff testified that she does not shower
on a daily basis because of her body pain.  Plaintiff testified
that she vacuums and makes the bed, but takes breaks while doing
so.  Plaintiff testified that she goes grocery shopping with her
roommate so that she can get out of the house.  Plaintiff testified
that she leaves the house three or four times a month.  Plaintiff
testified that she watches television but does not read.  Plaintiff
testified that people do not come to visit because she has no
friends.  Plaintiff testified that she visits her mother at her
mother's house.  Plaintiff testified that she has no hobbies other
than watching movies.  (Tr. 48-50.)  Plaintiff testified that she
has a driver's license but has not driven for two years because she
does not have access to a car and because her doctor advised her
not to drive due to her eyes and medication.  (Tr. 32.)

          Plaintiff testified that she lies down for hours
throughout the day and takes three or four naps a day lasting about
ten minutes each.  Plaintiff testified that she lies down for long
periods of time because she is tired and it is "hard for [her] to
go."  (Tr. 44-45.)

- 5 -

B.   <u>Testimony of Vocational Expert</u>

Steve Dolan, a vocational expert, testified at the hearing in response to questions posed by the ALJ.

Mr. Dolan characterized plaintiff's past work as a fast food worker as light and unskilled, and as a self-employed day worker as medium and unskilled.  (Tr. 52.)

The ALJ asked Mr. Dolan to assume a person of plaintiff's age, education and work experience and to further assume that such a person was "limited to work within the light exertional category; who needs to have occupations that involve only simple, routine, repetitive tasks with only occasional decision making required, with no interaction with the public."  (Tr. 52.)  Mr. Dolan testified that such a person could not perform any of plaintiff's past work.  Mr. Dolan testified, however, that such a person could perform work as a housekeeper or cleaner, and that 8,000 such jobs existed in the St. Louis area; as a hand packager, with 2,000 such jobs in the St. Louis area; and as a cafeteria attendant, with about 500 such jobs in the St. Louis area.  (Tr. 52-53.)

The ALJ then asked Mr. Dolan to assume an individual with the same limitations but with an additional limitation that she be limited to occupations that have only occasional changes in the work setting.  Mr. Dolan testified that such an additional limitation would not affect his answer to the previous hypothetical.  (Tr. 53.)

The ALJ then asked Mr. Dolan to assume an individual who was limited to the sedentary level of exertion, "with simple, routine, repetitive tasks required only[,] . . . and no interaction with the public."  (Tr. 54.)  Mr. Dolan testified that such a person could perform work as an assembler, and that about 2,000 such jobs existed in the St. Louis area.  (Tr. 54.)

The ALJ then asked Mr. Dolan to assume that same individual to be limited to a "work environment that's free of fast-paced production quotas; with simple work-related decisions only; and few, if any, workplace changes; with no interaction with the public."  (Tr. 54-55.)  Mr. Dolan responded that such a person could not perform any work at the sedentary level with the restriction on public interaction.  (Tr. 55.)

Mr. Dolan further testified that an individual in the unskilled labor market could miss work up to two days a month and still maintain employment, but that being absent two days *every* month would not be tolerated.   Mr. Dolan testified that an individual would routinely get three breaks per day in the unskilled labor market:  one fifteen-minute break during the first half of the day, a thirty-minute meal break, and a fifteen-minute break during the second half of the day.  (Tr. 55.)

### III.  Medical Records

From January 6, 2006, to March 3, 2006, while incarcerated at the Missouri Department of Corrections (MDOC),

plaintiff actively participated in group psychotherapy on eight occasions.  On each occasion, plaintiff's mental status examination was within normal limits and plaintiff was assessed as having a knowledge deficit.  (Tr. 192-95.)

An EKG taken on August 1, 2006, was normal.  (Tr. 198.)

Plaintiff visited an MDOC physician on August 5, 2006, who noted plaintiff's TSH levels associated with her hypothyroid condition to have changed.[2]  Plaintiff's Methimazole[3] was adjusted and plaintiff was instructed to complete her Propranolol.[4]  (Tr. 198.)

On October 21, 2006, the MDOC physician noted plaintiff's

---

[2]Hypothyroidism is condition in which the thyroid gland is underactive and does not produce enough thyroid hormone.  _Medline Plus_ _Hypothyroidism_ (last updated Feb. 27, 2012)<http://www.endocrine.niddk.nih.gov/pubs/Hypothyroidism/>.

[3]Methimazole (Tapazole) is used to treat hyperthyroidism, a condition that occurs when an overactive thyroid gland produces too much thyroid hormone.  _Medline Plus_ (last reviewed Sept. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682464.html>.

[4]Propranolol is a beta blocker used to treat high blood pressure, abnormal heart rhythms, heart disease, and certain types of tremor.  _Medline Plus_ (last revised Oct. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682607.html>.

- 8 -

hyperthyroidism to be improving.[5]   Plaintiff was instructed to decrease her PTU.[6]   Methimazole was prescribed.   (Tr. 199.)

Laboratory testing performed on December 18, 2006, showed plaintiff's thyroid levels to be within normal limits.   (Tr. 200.)

Plaintiff visited an MDOC physician on January 3, 2007, and reported no complaints.   Examination showed minimal exophthalmos of the eyes and minimal goiter.   Physical examination was otherwise unremarkable.   Plaintiff was diagnosed with hyperthyroidism under good control and asymptomatic.   Plaintiff was instructed to continue with Methimazole.   (Tr. 202-03.)

Plaintiff underwent a physical examination by the MDOC on February 9, 2007.   Plaintiff complained of joint pain and nausea. Mild proptosis of the eyes was noted.   Examination of the mouth and throat revealed evidence of goiter.   Plaintiff was diagnosed with hyperthyroidism for which it was noted that she was on suppressive medication.   Plaintiff was also diagnosed with bilateral bunions. (Tr. 196-97.)

Plaintiff visited an MDOC physician on March 31, 2007, and had no complaints.   Examination showed no exophthalamos of the

---

[5]Throughout the administrative record, the treatment notes refer to plaintiff's thyroid condition as either "hypothyroidism" or "hyperthyroidism."   The Court's summary of the medical evidence identifies the condition as it is stated in the respective medical note.

[6]PTU (Propylthiouracil) is used to treat hyperthyroidism. Medline Plus (last revised June 15, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682465.html>.

eyes.   Continued  improvement  of  plaintiff's  hyperthyroidism  was
noted.   Plaintiff  was  noted  to  be  asymptomatic  and  the  condition
was  under  good  control.   Plaintiff's  prescription  for  Methimazole
was  refilled.  (Tr. 209-10.)

Plaintiff  returned  to  an  MDOC  physician  on  June  23,  2007,
and  reported  that  she  was  doing  well  and  had  no  tachycardia.
Plaintiff  was  continued  in  her  diagnosis  of  hyperthyroidism  and  her
prescription  for  Methimazole  was  renewed.  (Tr. 213.)

On  July  26,  2007,  plaintiff  appeared  for  a  group  therapy
encounter  at  MDOC  during  which  it  was  noted  that  she  participated
and  cooperated  with  the  aftercare/discharge  planning  group  and  work
skills  group  appropriately.   Mental  status  examination  was  within
normal  limits.   Plaintiff  had  no  suicidal  or  homicidal  thoughts.
(Tr. 195.)

On  August  4,  2007,  it  was  noted  that  laboratory  testing
showed  plaintiff's  thyroid  levels  to  be  normal.   Plaintiff  reported
that  she  was  leaving  the  MDOC.   Plaintiff  was  instructed  to
continue  on  Methimazole.   Plaintiff  was  released  from  the  MDOC  on
August  27,  2007,  and  was  given  four  Methimazole  pills  upon  release.
(Tr. 214-15.)

Plaintiff  was  admitted  to  the  emergency  room  at  Forest
Park  Hospital  on  December  20,  2008,  with  complaints  of  left  sided
pain  radiating  to  the  lower  left  quadrant  of  the  abdomen.
Plaintiff  had  no  other  complaints.   An  x-ray  and  CT  scan  showed  a

kidney stone, and plaintiff underwent a cystoscopy with placement of a left ureteral stent. Plaintiff was discharged from the hospital on December 22, 2008. (Tr. 219-38.)

Plaintiff visited People's Health Centers on December 29, 2008, for evaluation of her goiter and thyroid. Plaintiff's recent stent placement was noted. (Tr. 260.) Physical examination was unremarkable. Plaintiff was instructed to drink a lot of fluid and was referred to the Urology Clinic at St. Louis Connect Care. (Tr. 264-65.)

Plaintiff returned to People's Health Centers on January 6, 1999, for follow up. Physical examination was unremarkable. Plaintiff was instructed to follow up with St. Louis Connect Care. (Tr. 266-67.)

Plaintiff visited People's Health Centers on January 21, 2009. Plaintiff's hyperthyroidism was noted and plaintiff reported having palpitations. It was noted that plaintiff had been without medication for eight months. Plaintiff was prescribed Propranolol and Methimazole and was referred to the Endocrinology Clinic. Plaintiff was instructed again to follow up with the Urology Clinic regarding her ureteral stent. (Tr. 269.)

On January 30, 2009, plaintiff visited St. Louis Connect Care for follow up of her kidney stone condition. Plaintiff reported her current medications to be Propranolol and Methimazole/ Tapazole. Plaintiff reported her medical history to include joint

- 11 -

problems and thyroid disease.  Plaintiff currently complained of continued flank pain and of hematuria.  Physical examination was unremarkable.  A KUB[7] was ordered and Ditropan[8] was prescribed. Plaintiff was instructed to return in three weeks.  (Tr. 253-56.)

Plaintiff returned to St. Louis Connect Care on February 27, 2009.  Plaintiff reported having no pain but felt pelvic pressure.  It was determined that plaintiff would undergo stent removal at the Urology Clinic.  (Tr. 251-52.)

On March 19, 2009, plaintiff visited Dr. Brody at St. Louis Connect Care for evaluation of her hyperthyroidism. Plaintiff related her past relevant history and reported that she stopped taking medication for her condition upon being released from prison in August 2007.  Plaintiff reported that testing performed in December 2008 showed her thyroid to be overactive and Methimazole and Metoprolol[9] were prescribed, but that she did not take the medication.  Plaintiff reported that she had palpitations, trouble breathing, and felt hot and sweaty.  Plaintiff had no

_____

[7]A KUB is an x-ray of the abdomen taken to examine the kidneys, ureters, and bladder.  Medline Plus *Abdominal X-ray* (last updated Feb. 10, 2010)<http://www.nlm.nih.gov/medlineplus/ency/ article 003815.htm>.

[8]Ditropan is used to control an overactive bladder.  Medline Plus (last revised Dec. 1, 2010)<http://www.nlm.nih.gov /medlineplus/druginfo/meds/a682141.html>.

[9]Metoprolol is a beta blocker used to treat high blood pressure and to prevent chest pain.  Medline Plus (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a682864.html>.

complaints of pain. Plaintiff was prescribed Methimazole and Propranolol and was instructed to get a radioactive iodine (RAI) scan. (Tr. 247-50.)

Plaintiff called Dr. Brody's office on May 19, 2009, and reported that she missed her appointment for the RAI scan. (Tr. 246.)

An RAI scan performed June 17, 2009, showed markedly elevated results consistent with hyperthyroidism. (Tr. 244.) A thyroid scan showed mild thyromegaly. (Tr. 243.)

Plaintiff returned to Dr. Brody on June 24, 2009, for follow up and reported that she was shaking. Plaintiff reported that she was not sleeping well and that she experienced occasional palpitations. Physical examination showed no exophthalmos, but extraocular movements were noted to be weak. Mild tremor was noted. Dr. Brody diagnosed plaintiff with hyperthyroidism and determined to treat plaintiff with RAI. Plaintiff was instructed to stop Propranolol. Metoprolol was prescribed. Plaintiff was instructed to refrain from taking Methimazole until after her RAI treatment. (Tr. 240-41.)

In a letter dated June 24, 2009, Dr. Brody wrote: "To Whom it May Concern, Please consider Stephanie Moore for disability. She suffers form hyperthyroidism." (Tr. 259.)

Plaintiff returned to People's Health Centers on July 22, 2009, for evaluation of dysmenorrhea and goiter. No complaints

- 13 -

were noted.  Plaintiff was instructed to continue with Propranolol, Vicodin[10] and Methimazole.  On July 27, 2009, plaintiff was evaluated for hyperthyroidism and bilateral knee and leg pain. Physical examination was unremarkable.  X-rays of the knees were ordered to rule out effusion.  Plaintiff was instructed to discontinue Propranolol and to continue with Vicodin and Methimazole.  Plaintiff was also prescribed Naproxen[11] and Metoprolol.  (Tr. 261, 263, 270, 275-76.)

On July 28, 2009, plaintiff was given RAI therapy for treatment of Graves' disease.  (Tr. 318.)

Plaintiff visited Dr. Brody on September 2, 2009, and complained of pain in the lower abdomen and in the low back. Plaintiff also reported breaking out in hives on her arms and legs after her iodine treatment.  Plaintiff reported that she was not sleeping well, felt hot, had palpitations, felt nervous, and was shaking.  Physical examination showed an enlarged thyroid.  Very mild tremor was noted.  Dr. Brody diagnosed plaintiff with hyperthyroidism and prescribed Metoprolol.  (Tr. 341.)

---

[10]Vicodin was first prescribed by People's Health Centers on January 6, 2009, in relation to plaintiff's kidney stone.  (Tr. 263.)

[11]Naproxen is used to relieve tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, ankylosing spondylitis, and pain from other causes.  Medline Plus (last revised June 15, 2012)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

In a letter dated September 2, 2009, Dr. Brody wrote: "To Whom it May Concern, Please consider Stephanie Moore for disability.  She suffers multiple symptoms from hyperthyroidism." (Tr. 277.)

On September 24, 2009, plaintiff underwent a consultative psychological evaluation for disability determinations. Psychologist Alison Burner noted plaintiff's complaints to be of having thyroid problems and a learning disability.  Plaintiff reported that she received special education for a learning disability and dropped out of school in the eighth grade.  Ms. Burner noted plaintiff's medical history of thyroid problems, and plaintiff reported that she takes eight medications.  Ms. Burner noted, however, that some prescriptions had expired several years prior and some were for antibiotics.  Ms. Burner also noted that plaintiff's most recent prescription was for high blood pressure and was dated May 2009.  Examination showed plaintiff's affect to be appropriate.  Plaintiff's full scale IQ was measured to be 78, which placed plaintiff in the borderline range of intellectual functioning.  Ms. Burner noted plaintiff to display no significant strengths or weaknesses and that all of plaintiff's skills appeared to be evenly developed.  Ms. Burner concluded that there did not appear to be a significant cognitive deficiency which would preclude plaintiff from obtaining and maintaining gainful employment.  Ms. Burner opined that plaintiff's school difficulties

- 15 -

were more likely related to being a slow learner rather than from a learning disability.  No psychological diagnosis was made.  (Tr. 278-80.)

Marsha Toll, Psy.D., completed a Psychiatric Review Technique Form for disability determinations on September 29, 2009, in which she opined that plaintiff's borderline intellectual functioning resulted in moderate difficulties in maintaining social functioning; mild restrictions of activities of daily living; no difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation.  (Tr. 282-92.)

In a Mental Residual Functional Capacity Assessment completed that same date, Ms. Toll opined that, in the area of understanding and memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was not otherwise limited.  In the area of sustained concentration and persistence, Ms. Toll opined that plaintiff was moderately limited in her ability to carry out detailed instructions, in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and in her ability to perform at a consistent pace without an unreasonable number and length of rest periods, but was not otherwise limited.  In the area of social interaction, Ms. Toll opined that plaintiff was moderately limited in her ability to interact appropriately with the general public, but was not otherwise limited.  (Tr. 293-95.)

- 16 -

Plaintiff visited Dr. Brody on October 14, 2009, and reported no complaints of pain.  Plaintiff reported that she continued to feel nervous, had hives, had restless legs, and continued to have palpitations.  It was noted that plaintiff stopped taking Metoprolol.  Examination showed plaintiff's thyroid to be enlarged.  Mild tremor was noted.  Plaintiff was diagnosed with hyperthyroidism and was instructed to stop smoking.  Dr. Brody prescribed Propranolol and referred plaintiff to the Ophthalmology Clinic.  (Tr. 337.)

Plaintiff returned to Dr. Brody on November 11, 2009, and complained of headaches and of experiencing chest pain on the left side radiating to the back.  Plaintiff also reported experiencing shaking, nervousness, and palpitations, but that such symptoms were not bad with Propranolol.  Physical examination showed the thyroid to be slightly enlarged and no eye symptoms.  No tremors were noted.  Dr. Brody diagnosed plaintiff with hypothyroidism and prescribed Levothyroxine.[12]  Plaintiff was instructed to stop Propranolol, to try to stop smoking, and to return in six weeks. (Tr. 334.)

Plaintiff visited Dr. Brody on December 23, 2009, and complained of leg pain, especially in the knees.  Plaintiff also reported having occasional palpitations and left sided chest pain.

_____

[12]Levothyroxine is used to treat hypothyroidism and goiter. Medline Plus (last reviewed Sept. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a682461.html>.

Dr. Brody noted plaintiff's previous diagnosis of hypothyroidism and her treatment for hyperthyroidism. Plaintiff reported that she was sleeping okay. Plaintiff reported that she was taking stress medications and muscle relaxants as prescribed by Dr. Najib. Physical examination showed plaintiff's thyroid to be slightly enlarged. No eye symptoms were noted. No tremors were noted. Crepitus was noted about the left knee with pain about both knees. Dr. Brody diagnosed plaintiff with hypothyroidism. Cartilage problems of the left knee were to be ruled out. Dr. Brody instructed plaintiff to continue with her current medications and to return in one month. (Tr. 330.)

Plaintiff visited Dr. Brody on January 10, 2010, and complained of left knee pain, with such pain reported to be at a level ten. Plaintiff also reported having sleeping difficulty, blurred vision, and muscle pain. Dr. Brody noted plaintiff's previous diagnosis of hypothyroidism. Physical examination showed questionable thyroid enlargement and no tremors. Dr. Brody diagnosed plaintiff with hyperthyroidism and prescribed Levothyroxine. Plaintiff was instructed to return in six weeks. (Tr. 327.)

On April 19, 2010, plaintiff visited Dr. Robert P. Poetz at the request of counsel for a consultative examination. Dr. Poetz noted plaintiff's history of hyperthyroidism. Plaintiff reported that she experiences shaking in her hands and legs,

- 18 -

fatigue, and sleep difficulties on account of the condition. Plaintiff also reported that she was transported to the hospital on one occasion when she began to shake and her throat closed up. Dr. Poetz also noted plaintiff's history of kidney stones and plaintiff reported that she experiences continued pain on the left side with occasional pain on the right. Plaintiff reported having pain and knots across her lower back which were extremely painful to the touch. Plaintiff reported that she had been hospitalized on several occasions because of kidney stones and that she had been advised that she currently had small kidney stones on the right side. Plaintiff reported to Dr. Poetz that she had been diagnosed with depression and anger issues and had been under psychiatric care in the past, with such care including medication. Plaintiff reported being full of fear and expressed concern that she will develop cancer like other members of her family. Plaintiff reported that she was currently seeking psychiatric care but was having difficulty due to lack of insurance and income. Plaintiff also complained of bilateral knee and lower leg pain and reported that she experiences popping and cracking in both knees with occasional locking of the left knee. Plaintiff also reported having pain in her calves with numbness/tingling into her ankles. Plaintiff reported a history of hypertension for which she received treatment while incarcerated. Plaintiff reported that her heart races and that her medication had been discontinued, but that she

understood that her thyroid medication would regulate the condition.  Finally, plaintiff reported that she currently experiences bunions and calluses on her feet, astigmatism in her right eye, and a knot on the dorsum of her left wrist which causes her ring finger to lock.  Plaintiff's current medications were noted to be Levothyroxine, Cyclobenzaprine,[13] and Naproxen. Laboratory tests showed poorly controlled cholesterol, and an increased heart rate but no other abnormalities of the heart. Physical examination showed plaintiff to walk with a normal gait. Plaintiff was able to move all joints of the upper and lower extremities well.  Crepitus was noted about the bilateral knees with hypertrophy and effusion.  Plaintiff's feet and hands were noted to be neurovascularly intact.  Plaintiff had good range of motion about the spine, and straight leg raising was negative. Plaintiff was noted to be tachycardic.  Neurological examination was unremarkable with deep tendon reflexes intact, and sensory and motor examination showing no deficits.  Dr. Poetz noted plaintiff to have an anxious demeanor and to be tearful at times.  Plaintiff reported having a "thinking problem" and that she had difficulty with focus at times.  Plaintiff reported feeling stressed.

---

[13]Cyclobenzaprine is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.  Medline Plus (last revised Oct. 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>. There is no indication in the record as to when this medication was prescribed, by whom, or for what condition.

Plaintiff reported having had two suicidal thoughts but no plan, with the last such thought occurring in 2000. Upon conclusion of the examination, Dr. Poetz diagnosed plaintiff with hypothyroidism; left ureteral stone with obstruction, status-post placement left ureteral stent; uncontrolled hypertension; untreated hyperlipidemia; major depressive disorder, untreated; borderline intellectual functioning; and bilateral knee pain with possible degenerative joint disease. Dr. Poetz recommended that plaintiff avoid prolonged sitting, standing, walking, stooping, bending, squatting, twisting, and climbing; avoid stressful situations; and avoid any activity that exacerbates symptoms or is known to cause progression of the disease process. Dr. Poetz recommended that plaintiff be on a beta blocker for tachycardia, undergo aggressive treatment of her severely uncontrolled hypertension, take an SSRI or SNRI for depression, be on statin therapy for treatment of hypyerlipidemia, undergo evaluation of her knee pain including x-rays, and take anti-inflammatory medications. Dr. Poetz opined that plaintiff was unable to maintain gainful employment due to her multiple health conditions. (Tr. 303-08.)

In a Medical Source Statement completed that same date, April 19, 2010, Dr. Poetz set out his diagnoses of plaintiff and opined that plaintiff could sit for six hours in an eight-hour workday, stand for one hour in an eight-hour workday, and walk for one hour in an eight-hour workday. Dr. Poetz opined that plaintiff

could continuously lift and carry one to two pounds, frequently lift and carry five pounds, occasionally lift and carry ten pounds, and could never lift and carry twenty or more pounds.  Dr. Poetz opined that plaintiff had no manipulative limitations nor any limitations with balance.  Dr. Poetz reported that plaintiff experienced pain on account of her knees and kidney stones and that such pain was objectively indicated by reduced range of motion, and subjectively indicated by complaints of pain, weight loss or gain, and sleeplessness.  Dr. Poetz opined that plaintiff's pain would preclude her from focusing on simple tasks during a full-time work schedule.  Dr. Poetz further opined that plaintiff's impairments would require her to lie down or take a nap during a workday and would require her to take more than three breaks during a workday on account of fatigue and lack of focus.  Dr. Poetz opined that plaintiff's impairments would cause plaintiff to miss work each month on three or more occasions.  Dr. Poetz opined that the limitations described lasted or could be expected to last twelve or more months and have existed since at least December 2008.  (Tr. 309-11.)

## IV.  The ALJ's Decision

The ALJ found plaintiff not to have engaged in substantial gainful activity since June 25, 2009.  The ALJ determined plaintiff's borderline intellectual functioning and hypothyroidism/Graves' disease to constitute severe impairments,

but that plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpt. A, App'x 1.  The ALJ found plaintiff to have the residual functional capacity (RFC) to perform light work but with limitations to occupations involving simple, routine, and repetitive tasks that are low stress in nature.  The ALJ defined such jobs as those with only occasional changes in decision making and changes in work settings, and no interaction with the public. The ALJ determined plaintiff not able to perform her past relevant work.  Considering plaintiff's age, education, communication skills, job skills, and RFC, the ALJ determined plaintiff able to perform other work that exists in significant numbers in the national economy, and specifically, housekeeper/cleaner, hand packager, and cafeteria attendant.  The ALJ thus found plaintiff not to be under a disability since June 25, 2009.  (Tr. 12-20.)

## V.  Discussion

To be eligible for Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  See 20 C.F.R. § 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the

Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

> 4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.
>
> 5.   Any corroboration by third parties of the plaintiff's impairments.
>
> 6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Here, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ erred in his analysis

of the medical evidence of record, and specifically, the medical opinions of Drs. Brody and Poetz.  Plaintiff further contends that the ALJ's RFC determination is not supported by medical evidence, and the ALJ erred by failing to include a narrative discussion supporting his RFC conclusions.  The Court will address each of plaintiff's arguments in turn.

      A.     <u>Opinion Evidence</u>

In his written decision, the ALJ acknowledged Dr. Brody's two letters in which he requested that plaintiff be considered disabled due to symptoms associated with hyperthyroidism.  The ALJ determined not to accord great weight to these letters.  (Tr. 16.)  The ALJ also acknowledged Dr. Poetz's consultative opinion that plaintiff's limitations prevented her from maintaining gainful employment.  The ALJ assigned very little evidentiary weight to this opinion.  (Tr. 18.)  Plaintiff claims that the ALJ erred in his treatment of these medical opinions.

      1.   *Dr. Brody*

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources and non-examining sources.  <u>See</u> 20 C.F.R. § 416.927(f)(2)(ii).[14]   The Regulations

---

[14]Citations to 20 C.F.R. § 416.927 are to the 2010 version of the Regulations which were in effect at the time the ALJ rendered the final decision in this cause.  This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the

require that more weight be given to the opinions of treating physicians than other sources.  20 C.F.R. § 416.927(d)(2).  A treating physician's assessment of the nature and severity of a claimant's impairments should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  Id.; see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004).  This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(d)(2).

However, a medical source's opinion that an applicant is "unable to work" involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit.  Ellis v. Barnhart, 392 F.3d 988, 994-95 (8th Cir. 2005).

When a treating physician's opinion is not given

---

substance therein.

- 28 -

controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion. 20 C.F.R. § 416.927(d)(2).  Such factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty.  Id.  The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."  Id.

In his decision here, the ALJ determined not to accord great weight to Dr. Brody's letters in which he opined that plaintiff was disabled due to symptoms arising from her thyroid condition.  A review of the ALJ's decision *in toto* shows the ALJ to have reached this conclusion after summarizing the evidence of record and noting that such evidence failed to show any objective signs of limiting deficits in relevant areas of, *inter alia,* neurological functioning, muscular functioning, range of motion, cognitive functioning, behavioral functioning, cardiovascular functioning, and visual functioning.  In addition, the ALJ noted that no medically acceptable clinical and laboratory diagnostic techniques demonstrated any disabling limitations.  (Tr. 15-16.) As such, the ALJ did not err in failing to accord Dr. Brody's

- 29 -

opinion less than controlling weight.  20 C.F.R. § 416.927(d)(2);
Forehand, 364 F.3d at 986.  See also Cox v. Barnhart, 345 F.3d 606,
608 (8th Cir. 2003) ("It is the ALJ's job to reach a decision as
the claimant's legal disability by evaluating the objective medical
evidence before him.").

      In addition, the ALJ noted that while plaintiff
complained of fatigue, poor sleep, and shaking on account of her
thyroid condition, the objective medical evidence showed
plaintiff's condition to be mild in nature and, further, that
plaintiff neither sought nor received aggressive treatment for the
condition.  (Tr. 16.)  These reasons for discounting Dr. Brody's
conclusory opinion of disability are supported by substantial
evidence on the record as a whole and constitute "good reasons"
under § 416.927(d)(2).  See Owen v. Astrue, 551 F.3d 792, 799 (8th
Cir. 2008) (objective evidence of mild impairment supported ALJ's
conclusion not to give treating physician's opinion controlling
weight); Kirby v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (ALJ
entitled to discount opinion where opinion is based largely on
claimant's subjective complaints rather than on objective medical
evidence)[15]; Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir.

_____

    [15]Although plaintiff does not challenge the ALJ's credibility
determination here, a review of the ALJ's decision nevertheless
shows that, in a manner consistent with and as required by Polaski
v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (subsequent history
omitted), the ALJ thoroughly considered the subjective allegations
of plaintiff's disabling symptoms on the basis of the entire record
before him and set out numerous inconsistencies detracting from the

2005) (failure to document objective medical evidence to support subjective complaints justified giving less weight to treating physician's opinion); Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (failure to seek aggressive medical care not suggestive of disabling condition); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment and limited use of prescription medications not suggestive of disabling condition).

Finally, as noted above, a medical source's opinion that an applicant is "unable to work" involves an issue reserved for the Commissioner and is not the type of opinion which the Commissioner must credit.  Ellis, 392 F.3d at 994-95.  A treating physician's finding that a claimant is totally disabled is entitled to no deference "because it invades the province of the Commissioner to make the ultimate disability determination."  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) (internal quotation marks and citation omitted).

Accordingly, the ALJ was permitted to disregard Dr. Brody's conclusory opinion, unsupported by the objective medical evidence, that plaintiff was disabled on account of her thyroid

---

credibility of such allegations.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

condition.  The ALJ therefore did not err in his treatment of such opinion set out in Dr. Brody's letters.

    2.   *Dr. Poetz*

        Plaintiff claims that the ALJ erred by failing to analyze Dr. Poetz's opinion under the factors set out in 20 C.F.R. § 416.927(d) in determining what weight to accord the opinion.  Dr. Poetz was not plaintiff's treating physician, but rather a consulting physician who conducted a one-time examination of plaintiff at counsel's request.

        The Regulations do not require an ALJ to specifically discuss in his written decision the § 416.927(d) factors when determining what weight to accord an opinion rendered by a non-treating, consulting physician.  Instead, the Regulations require the ALJ to only *consider* such factors.  Specific discussion is required only when an ALJ determines to accord a *treating* physician's opinion less than controlling weight.  As such, an ALJ's failure to specifically discuss the § 416.927(d) factors in relation to an opinion from a *consulting* physician does not necessarily lead to the conclusion that he failed to consider them, and does not in itself render the ALJ's decision suspect.  An arguable deficiency in opinion-writing technique does not require reversal of an ALJ's decision if such deficiency had no bearing on the outcome of the proceeding.  Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008).  Given the ALJ's thorough discussion of all the

- 32 -

evidence of record — including a summary of the examination conducted by Dr. Poetz, the ALJ's acknowledgment that Dr. Poetz performed a one-time consultative examination, and Dr. Poetz's conclusions therefrom — it cannot be said that the ALJ failed to consider the § 416.927(d) factors in determining what weight to accord Dr. Poetz's opinion.

To the extent plaintiff argues that the ALJ erred in according Dr. Poetz's opinion very little evidentiary weight, a review of the ALJ's decision in conjunction with the record as a whole shows the ALJ not to have erred.  First, as noted by the ALJ, the objective medical findings made within the evaluation itself were inconsistent with Dr. Poetz's ultimate conclusion that plaintiff experienced significant functional limitations and was unable to be gainfully employed.  Specifically, Dr. Poetz's physical examination showed that plaintiff could walk with a normal gait, could move all joints of the upper and lower extremities well, had good range of motion about the spine, was neurovascularly intact about the hands and feet, had negative straight leg raising, and was neurologically intact with deep tendon reflexes and sensory and motor examination.  Despite these unremarkable physical findings, Dr. Poetz opined that plaintiff could not engage in prolonged sitting, standing, walking, stooping, bending, squatting, twisting, or climbing; could not focus on account of pain; was required to lie down or nap throughout the day; and could not lift

- 33 -

in excess of ten pounds.  Because of the inconsistencies between Dr. Poetz's findings made during his evaluation of plaintiff and his resulting opinion, the ALJ did not err in according little weight to Dr. Poetz's opinion.  See Wagner v. Astrue, 499 F.3d 842, 849-50 (8th Cir. 2007) (and cases cited therein) (physician opinions that are internally inconsistent are entitled to less deference).  Indeed, as noted by the ALJ, the significant limitations as opined by Dr. Poetz appeared largely to be based on plaintiff's subjective complaints rather than on the medical evidence.  See Renstrom, 680 F.3d at 1064 (ALJ entitled to discount opinion where opinion is based largely on claimant's subjective complaints rather than on objective medical evidence); Kirby, 500 F.3d at 709 (same).[16]  Finally, as with Dr. Brody's opinion of disability, the ALJ properly noted that Dr. Poetz's opinion that plaintiff could not be gainfully employed addressed an issue reserved to the Commissioner.  An ALJ need not credit a physician's ultimate conclusion that a claimant is disabled.  Renstrom, 680 F.3d at 1065; Ellis, 392 F.3d at 994-95.

Accordingly, the ALJ did not err in his treatment of Dr. Poetz's opinions regarding plaintiff's limitations of function and her inability to engage in gainful employment.

B.  RFC Determination

Plaintiff claims that the ALJ erred in his RFC

_____

[16]See supra n.15.

- 34 -

determination inasmuch as, by discounting the opinions of Drs. Brody and Poetz, no medical evidence supported his RFC findings. Plaintiff also claims that the ALJ erred by failing to include in his decision a narrative discussion describing how the evidence supported his RFC conclusions.

A claimant's RFC is what she can do despite her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). The claimant has the burden to establish her RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. § 416.945(a). A claimant's RFC is a medical question, however, and some medical evidence must support the ALJ's RFC determination. Eichelberger, 390 F.3d at 591; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly

informed and supported by some medical evidence in the record
cannot stand.  Id.

> The RFC assessment must include a narrative
> discussion describing how the evidence
> supports each conclusion, citing specific
> medical facts (e.g., laboratory findings) and
> nonmedical evidence (e.g., daily activities,
> observations).  In assessing RFC, the
> adjudicator must discuss the individual's
> ability to perform sustained work activities
> in an ordinary work setting on a regular and
> continuing basis (i.e., 8 hours a day, for 5
> days a week, or an equivalent work schedule),
> and describe the maximum amount of each work
> related activity the individual can perform
> based on the evidence available in the case
> record.  The adjudicator must also explain how
> any material inconsistencies or ambiguities in
> the evidence in the case record were
> considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (S.S.A. July 2, 1996) (footnote
omitted).

A review of the ALJ's decision and the relevant evidence of record
shows the ALJ to have engaged in the proper analysis as to
plaintiff's RFC.  Some medical evidence supports the ALJ's
determination and, for the following reasons, such determination is
supported by substantial evidence on the record as a whole.

First, a review of the ALJ's decision shows him not to
have discounted any of the objective medical evidence of record,
but only the unsupported conclusory opinions that plaintiff was
disabled and unable to be gainfully employed.  As such, plaintiff's
assertion that the failure to credit Drs. Brody's and Poetz's

opinions regarding plaintiff's disability left the record devoid of medical evidence to support the ALJ's adverse finding is without merit.

Nevertheless, plaintiff claims that no medical evidence supports the ALJ's findings regarding plaintiff's ability to lift and perform the exertional demands of light work.[17]  The undersigned notes, however, that upon review of the medical evidence of record, the ALJ determined there to be no medically determinable impairment which could result in plaintiff's claimed back or knee pain, or muscle or joint pain.  (Tr. 15.)  Plaintiff does not challenge this finding.  The Commissioner's assessment of a claimant's RFC can consider "only functional limitations and restrictions that result from an individual's medically determinable impairment[.] . . . It is incorrect to find that an individual has limitations beyond those caused by . . . her medically determinable impairment(s) and any related symptoms[.]"  SSR 96-8p, 1996 WL 374184, at *1. Indeed, a finding of disability can be based only on a medically determinable physical or mental impairment.  Marolf v. Sullivan,

---

[17]    Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b).

981 F.2d 976 (8th Cir. 1992).  An ALJ is only required to rely on those impairments which he finds credible and supported by the record.  He is not obligated to rely on limitations not supported by the medical evidence of record.  See Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996); Lorenzen v. Chater, 71 F.3d 316, 318 (8th Cir. 1995); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995).  Here, as noted above, the ALJ found no medically determinable impairment which would cause the postural limitations as alleged by plaintiff such that she could not perform the exertional demands of light work.  As such, the ALJ did not err by failing to discuss alleged functional limitations and restrictions caused thereby.  To the contrary, it would have been error for the ALJ to do so.  SSR 96-8p, 1996 WL 374184, at *1.

Plaintiff also claims that, after determining he could not rely on the opinions of the only treating and examining physicians of record, the ALJ should have recontacted Dr. Brody for additional or clarifying information.  An ALJ is not required, however, to seek such information from a treating physician unless a crucial issue is undeveloped.  Goff, 421 F.3d at 791 (citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).  While the Regulations provide that the ALJ should recontact a treating physician in some circumstances, "that requirement is not universal." Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006).  Instead, the Regulations provide that the ALJ should recontact

medical sources "[w]hen the evidence [received] from [the claimant's] treating physician or psychologist or other medical source is inadequate" for the ALJ to determine whether the claimant is disabled. 20 C.F.R. § 416.912(e). There is no need to recontact a treating physician where the ALJ can determine from the record whether the claimant is disabled. Hacker, 459 F.3d at 938. As set out above, there was sufficient medical evidence in the record from which the ALJ could determine plaintiff's RFC resulting from plaintiff's medically determinable impairments. The ALJ therefore did not err in failing to recontact plaintiff's treating physician to obtain additional or clarifying information relating thereto.

Finally, to the extent plaintiff claims that the ALJ committed legal error by failing to cite specific evidence supporting his RFC conclusions, the undersigned notes the Eighth Circuit's recent statement that the Court's role is to "review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations[.] . . . [W]e do not require an ALJ to mechanically list and reject every possible limitation." McCoy v. Astrue, 648 F.3d 605, 615 (8th Cir. 2011). While the ALJ did not present his RFC findings in bullet-point format with each limitation immediately followed by a discussion of the supporting evidence, such a rigid format is not required by Social Security Ruling 96-8p, as plaintiff seems to suggest. The ALJ conducted a

thorough analysis of all of the medical evidence, non-medical evidence, and the consistency of such evidence when viewed in light of the record as a whole, and formulated a specific RFC that took into account all of plaintiff's limitations caused by her medically determinable impairments that the ALJ found credible and supported by the record.  Because some medical evidence supports this determination, the ALJ's RFC assessment must stand.  See Steed v. Astrue, 524 F.3d 872, 876 (8th Cir. 2008).

### VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ did not legally err in his determination to deny plaintiff disability benefits, and the decision is supported by substantial evidence on the record as a whole.  As such, plaintiff's claims of error should be denied. Hensley v. Barnhart, 352 F.3d 353, 355 (8th Cir. 2003).  Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).

Accordingly, the Commissioner's determination that plaintiff was not disabled should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.


_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE


Dated this 26th day of September, 2012.